

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EJD:SP
F. # 2024R00967

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 8, 2025

<u>By ECF and E-mail</u>

The Honorable Clay H. Kaminsky
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Todd Padavona
               <u>Criminal Docket No. 25-CR-376 (EK)</u>

Dear Judge Kaminsky:

       The government respectfully submits this letter in support of its request that the Court enter a permanent order of detention against defendant Todd Padavona. As set forth below, this defendant poses a danger to the community and a risk of flight. There are no conditions or combinations of conditions sufficient to ensure this defendant's return to court and to mitigate the danger he poses to the public. Therefore, Padavona should be detained pending trial.

I.     <u>Background</u>

       On December 3, 2025, a grand jury sitting in the Eastern District of New York returned an indictment charging: (1) Todd Padavona with two counts of extortionate collection of credit and one count of extortionate collection of credit conspiracy and (2) Barry Gold with one count of extortionate collection of credit and one count of extortionate collection of credit conspiracy in violation of Title 18, United States Code, Section 894(a)(1) (the "Indictment").

       The Indictment is the result of an investigation into extortionate loans that members and associates of the Bonanno organized crime family were collecting from victims in this District. As a part of that investigation, law enforcement agents identified and interviewed victims who were threatened to make payments on alleged debts to defendant Todd Padavona and his brother, Michael Padavona. For failing to make timely payments on these alleged debts, defendant Todd Padavona threatened to physically harm the victims or their family members. Defendant Barry Gold conspired with Todd Padavona to deliver such threats on behalf of defendant Todd Padavona.

The evidence supporting the charges includes, among other things, the following: (1) audio recordings of threats that the defendants communicated to the victims; (2) bank records of extortionate funds received by the defendants and co-conspirators; (3) law enforcement's physical surveillance of meetings between defendant Todd Padavona and an extorted victim; and (4) toll records showing communications between the defendants and co-conspirators on or about the same day that victims were threatened by the defendants or made extortionate payments.

II.    <u>Offense Conduct</u>[1]

    A.    <u>The Defendants Threaten a Victim (John Doe) and John Doe's Family</u>

As alleged in the Indictment, the defendants Todd Padavona and Barry Gold engaged in extortionate collection of credit from John Doe and conspired to do the same between August 2024 and December 2024.  To carry out their criminal conduct, Padavona and Gold engaged in a combination of tactics, including sending threats and surveilling John Doe's residence, in an attempt to induce John Doe to pay a $160,000 debt that Todd Padavona and Michael Padavona alleged John Doe owed.  During this time period, Gold suggested to John Doe that Padavona would harm Doe or his family if Doe did not pay his debt.  Padavona's actions, including appearing at Doe's home and photographing Doe's daughter's car and Doe's residence lent gravity to the threats.

Gold and Padavona's extortion of John Doe began in or around August 2024. That month, Padavona went to John Doe's house when John Doe was not home and told John Doe's wife that he was looking for John Doe.  On or around the date of this visit, Gold also sent a text message to John Doe and a photograph of John Doe's daughter's car parked outside John Doe's residence.  The text message that Gold sent to John Doe read, "[…] Todd wants to know if you want to come out and play."  Based on the evidence in this case, Padavona took the photograph of John Doe's residence and John Doe's daughter's car parked outside and sent it to Gold.

On or about December 20, 2024 Gold further threatened John Doe on a consensually recorded call.  On this call, Gold told John Doe, to "[…] read between the lines" and that "[Gold] was told to tell [John Doe] that someone was outside […] to say hello to [John Doe] and to wish [John Doe] happy holidays."  Gold later confirmed on this recorded call that Padavona was the person outside John Doe's residence.

    B.    <u>Defendant Padavona Threatens Jane Doe and Jane Doe's Family</u>

As alleged in the Indictment, Padavona engaged in extortionate collection of credit from a second victim, Jane Doe, between March 2025 and July 2025.  During this time

---

[1]    The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.  The government is entitled to proceed by proffer in a detention hearing. <u>United States v. Abuhamra</u>, 389 F.3d 309, 320 n.7 (2d Cir. 2004); <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000).

period, Padavona threatened Jane Doe with graphic and explicit threats of violence for failing to meet his demands for payment on a $113,000 debt he alleged that Jane Doe owed. On one consensually recorded call, Padavona told Jane Doe, "No, you're gonna see me—you're gonna see me when you're fucking dead."

On another consensually recorded call, Padavona threatened to "split [Jane Doe's husband's] head open" and told Jane Doe that he did not want to "[…] hear no more fucking stories."

Padavona threatened additional members of Jane Doe's family, telling Jane Doe, "Guess what? Check on your father tonight, make sure he's gonna be ok" and that he "hope[s] he fucking winds up, fucking, you know, alive." The threats Padavona made to Jane Doe were clear and intended to convey the consequences of Jane Doe failing to meet Padavona's demands for payment—violence or even death.

III.    Legal Standard

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1)," which includes a "crime of violence," or that the defendant presents a risk of flight or obstruction of justice" under Section 3142(f)(2). Id. "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

If the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order" a defendant detained. 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

IV.    <u>Detention is Warranted as to Padavona</u>

        The Court should enter a permanent order of detention because Padavona is charged with a crime of violence (<u>see</u> 18 U.S.C. § 3142(f)(1)(A)), poses a serious risk of flight (<u>see</u> 18 U.S.C. § 3142(f)(2)(A)) and because there is a serious risk that he will threaten or intimidate prospective witnesses (<u>see</u> 18 U.S.C. § 3142(f)(2)(B)).  No condition or combinations of bail conditions of release will protect the safety of the community, the witnesses, and reasonably assure the defendant's appearance at trial.

      A.    <u>The Nature and Circumstances of the Charged Offenses</u>

        The seriousness of the danger posed by the defendant's release should not be underestimated given the nature and circumstances of the charged offenses.

        The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged, including whether the offense is a crime of violence, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).  In addition, a court may order detention if there is a "serious risk that the [defendant] will . . . obstruct or attempt to obstruct justice, or . . .  intimidate . . . a prospective witness," among other things.  18 U.S.C. § 3142(f)(2)(B).

        In the Court's consideration of the first factor — the nature and circumstances of the offense — Bail Reform Act instructs Courts to consider whether the offense is a crime of violence.  The Bail Reform Act defines "crime of violence" in two ways:  first, as an offense that "has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and second, as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 3156(a)(4)(A), (B).

        Extortionate collection of credit and conspiracy to commit the same qualify as crimes of violence under the Bail Reform Act.  Indeed, the statute makes it an offense if one "knowingly participates in any way . . . in the use of any extortionate means" to collect an extension of credit.  18 U.S.C. § 894(a)(1).  "Extortionate means" is defined as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."  <u>See</u> 18 U.S.C. § 891(7).  Such a determination has long been the law of this Circuit.  <u>See</u> <u>United States v. Cicale</u>, 2006 WL 2252516 (E.D.N.Y. Aug. 7, 2006) ("It is the law of this circuit, as conceded by the defense . . . , that the two loansharking counts against Cicale are crimes of violence, and are especially probative of dangerousness where, as here, the Defendant is alleged to have assaulted a victim to collect a debt." (citing <u>United States v. Rodriguez</u>, 950 F.2d 85, 88 (2d Cir. 1991) (finding that violence committed "over a small debt is probative of dangerousness"))); <u>see also</u> <u>United States v. Maratea</u>, No. 18-CR-337-5 (WFK), 2018 WL 11191537, at *3 (E.D.N.Y. Nov. 20, 2018) (extortionate extension of credit, extortionate collection of credit and conspiracy to commit those offenses qualify as crimes of violence pursuant to the Bail Reform Act); <u>United States v. DiSano</u>, No. 18-CR-337-3 (WFK), 2018 WL 11191538, at *3 (E.D.N.Y. Dec. 14, 2018)

(same); <u>United States v. Persico</u>, No. 10-CR-147 (DLI), 2017 WL 3669554, at *3 (E.D.N.Y. Aug. 23, 2017) (extortionate extension of credit properly is identified as a crime of violence for purposes of the Bail Reform Act); <u>see also United States v. DiGiacomo</u>, 746 F. Supp. 1176, 1185 (D. Mass. 1990) (designating loansharking as "crime of violence" for Bail Reform Act purposes).

Therefore, the Court may properly consider that Padavona is charged with crimes of violence in weighing the nature and circumstances of the offenses.  In addition, all other factors enumerated in the Bail Reform Act weigh in favor of Padavona's detention, including the weight of the evidence against him, his history and characteristics and the danger his release would pose to members of the community.  The government's investigation has captured multiple recorded conversations in which Padavona threatened victims and their families in graphic and unambiguous terms.

As detailed extensively above, the nature and circumstances of the charged offenses are indisputably serious.  Padavona used unlawful means to attempt to collect debts that he believed the victims owed him or his family.  Padavona harassed John Doe by going to John Doe's residence, taking photographs of John Doe's residence, making sure that John Doe also received those photographs, and using a co-conspirator to communicate threats to John Doe. Padavona also threatened to kill Jane Doe and her family members and insinuated that he knew where they lived.  Padavona's actions and words were meant to make Jane Doe and John Doe feel unsafe and that they had no agency over their own lives.  For example, on a consensually recorded call, Padavona told someone who appeared to be with him, but not participating on the call, "I mean seriously.  I mean she thinks I'm fucking playing with her.  She don't realize I'll fucking kill her whole family.  I will kill them all."

In another example, Padavona told Jane Doe, "I am not threatening you. I'm telling you the fucking dead serious truth."  In response, Jane Doe told Padavona that he "[…] just said [he'll] see [her] when [she's] dead," Padavona told her, "You, your husband, your kids, yous all got fucking problems.  You got that?"

Padavona's threats to John Doe and Jane Doe have no justification or excuse. Padavona's threats to harm Jane Doe and her family were meant to terrorize Jane Doe into making payments on her alleged debt, and they were successful.   Both Jane Doe and John Doe have informed law enforcement that Padavona's conduct terrified them and made them fearful for their family members' safety.  Given his demonstrated willingness and brazenness in threatening civilians with violence, or even at times, death, there is a substantial risk that, if allowed to remain at liberty, Padavona would continue to engage in these unlawful activities.

B.    The Defendants' Histories and Characteristics

Padavona's history and characteristics also weigh in favor of detention, as they show that Padavona is capable of and willing to use violence against others.

Padavona pled guilty on or about September 13, 2024 in Nassau County Court to assault in the second degree (intent to cause physical injury with a weapon/instrument), in violation of New York State Penal Law ("N.Y.P.L.") (120.05(2)) and assault in the third degree

(with intent to cause physical injury), in violation of N.Y.P.L. (120.00(1)), and was sentenced to two terms of probations, for three years and five years, to run concurrently to one another. During the course of this investigation, law enforcement interviewed the Victim in the Nassau County case (the "Victim"). According to the Victim, the Victim was having dinner with his wife in a restaurant, when the Victim's wife got into an argument with another female customer at the restaurant. The argument subsided, and the Victim and the Victim's wife went outside the restaurant to smoke. The female customer followed the Victim and the Victim's wife outside and continued the argument. An unknown male—who was later identified to be Todd Padavona—approached the Victim, waved a knife approximately three to four inches long in the Victim's face, and told the Victim that the Victim had threatened Padavona's granddaughter. Padavona then punched the Victim's wife in the face so that she fell to the ground. The Victim punched Padavona a few times and fell to the ground with Padavona. The Victim then felt pain in the Victim's leg and saw that he was bleeding profusely from a deep slash wound inflicted by Padavona. The Victim required approximately twelve stitches for the laceration which spanned the width of his entire thigh, and reported the incident to the Nassau County Police Department. When law enforcement investigating this matter interviewed the Victim approximately two years after Padavona had cut the Victim with the knife, the Victim was still suffering from nerve damage from the injury.

Accordingly, at the time that Padavona was engaging in the above-described extortion and threats to John Doe and Jane Doe, Padavona was on probation. The fact that Padavona was willing to blatantly engage in criminal conduct and make violent threats while he was on probation for a violent crime demonstrates that he will not follow the Court's rules and should be detained. Padavona's conduct while on Probation further indicates that he is unlikely to comply with conditions of release set by the Court in this matter.

C.    The Strong Evidence of the Defendants' Guilt Provides an Incentive to Flee

As discussed above, the evidence of Padavona's guilt is exceedingly strong. The government intends to prove Padavona's guilt at trial through, among other things, consensual audio recordings; testimony of multiple witnesses; toll records and other documentary evidence. The weight of the evidence heightens the defendant's incentive to flee. Gold and Padavona are both audio-recorded delivering threats to victims that are clearly meant to intimidate them, fear for their and their families' safety, and demand their compliance to make extortionate payments. The evidence of Padavona's criminal conduct also includes telephone records showing his communications with other co-conspirators during the relevant time periods of the conspiracies. Where, as here, the evidence of guilt is strong, it provides "a considerable incentive to flee." Millan, 4 F.3d at 1046; see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

Padavona also has a strong incentive to flee in light of the sentence that he is facing. The maximum term of imprisonment for extortionate collection of credit is 20 years. See 18 U.S.C. § 894(a). For Padavona, who appears to have spent little to no time in prison thus far, facing a significant potential term of imprisonment heightens his flight risks. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987) (finding that the government showed that each of the statutory factors weighed in favor of detention, including the possibility of a severe

sentence).  Relatedly, any proposed used of home detention and/or electronic monitoring in lieu of detention is insufficient in light of Padavona's conduct, risk of flight and incentive to flee, as it "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills."  United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993); see United States v. Zarrab, No. 15 CR 867 (RMB), 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016).[2]  Notably,

---

[2]        Recent history in this district bears this out, with numerous defendants fleeing or otherwise attempting to thwart electronic monitoring after being released pretrial. See United States v. Svetlana Dali, 24-MJ-645 (JAM) (defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border); United States v. Horst Jicha, 23-CR-342 (OEM) (defendant charged with securities fraud and associated crimes cut his location monitoring device while on pretrial release and absconded days before he was supposed to appear for a status conference and remains at large); United States v. Tony Clanton, 23-CR-328 (KAM) (defendant cut his location monitoring device on the eve of trial); United States v. Georges Barker, 23-MJ-27 (SIL) (defendant in an extradition proceeding tampered with his location monitoring bracelet on two occasions before he was remanded); United States v. William Bartell, 22-CR-80 (EK) (defendant charged with multiple bank robberies cut his location monitoring device and absconded within one week of being released on bail due to medical issues); United States v. Joey Macario, 22-CR-342 (HG) (defendant charged with fraud absconded after removing his location monitoring device and discarding it on the subway tracks moments after being released to attend drug treatment); United States v. Dewayne Tripp, 22-CR-336 (MKB) (defendant absconded instead of appearing at a bond revocation hearing and was only located after being arrested for a domestic violence incident); United States v. Marius Lacatis, 22-CR-190 (BMC) (defendant, a Romanian national involved in a fraud conspiracy, was released on bond following his arrest in California and ordered to report to the Eastern District of New York; instead, he cut his location monitoring device, fled and remains at large); United States v. Marcus Deloatch, 21-CR-457 (ENV) (defendant charged with Hobbs Act robbery cut his location monitoring device and fled in advance of a bail revocation hearing); United States v. Herman Baron, 21-CR-307 (NGG) (defendant charged with narcotics trafficking and COVID fraud cut his location monitoring device and fled the jurisdiction approximately one hour before his scheduled change-of-plea hearing; arrested five months later in the Northern District of Georgia); United States v. Michael Artis, 20-CR-409 (PKC) (defendant released following a violation of supervised release cut his location monitoring device and failed to appear at bail revocation hearing); United States v. Charles May, 19-CR-539 (FB) (defendant charged with armed robbery absconded while on home detention and remains at large); United States v. Theressa Riddle, 17-CR-491 (JS) (defendant United States v. Sinmyah Amera Ceasar, 17-CR-048, 19-CR-117, 22-CR-459 (KAM) (defendant cut her electronic monitoring device and tried to flee the country after the Second Circuit ordered her resentenced and government discovered evidence of her violation release conditions); United States v. Guanghua Shen, 18-CR-302 (MKB) (defendant cut her electronic monitoring device at JFK Airport the day before she was required to self-surrender to the Bureau of Prisons); United States v. Akmal Narzikulov, 13-CR-601 (RJD) (defendant cut his electronic bracelet days after being released on bail); United States v. Julian Tzolov, 08-CR-370 (JBW) (defendant in fraud scheme attempted to flee to Spain while on location monitoring).

a significant amount of Padavona's criminal conduct, as it related to Jane Doe, was carried out over the phone—home detention and GPS monitoring are not adequate deterrents.

  D. <u>Only Detention Can Mitigate the Risk that Padavona Will Attempt to Obstruct Justice or Intimidate Witnesses</u>

    Furthermore, Padavona should be detained pending trial because of the serious risk that he will obstruct justice, threaten witnesses, intimidate witnesses, or attempt to do so. <u>See</u> 18 U.S.C. § 3142(f)(2)(B). Padavona has already demonstrated that he has no qualms about violently and graphically threatening others. In fact, Padavona has already threatened to "split [Jane Doe's husband's] head open" and that he will "[…] fucking kill her whole family. I will kill them all." Padavona made clear to Jane Doe that his threats were not bluster, telling her, "You're gonna see me when you're fucking dead. You understand that? […] I am not threatening you. I'm telling you the fucking dead serious truth." Padavona has also been willing to convey his threats through other individuals, such as co-conspirator Gold, as Padavona took photos of John Doe's residence, told Gold to wish John Doe "happy holidays" and told Gold to tell John Doe that he was outside John Doe's residence. Padavona's own conduct in this case could not serve as clearer proof of the risk he poses of obstructing justice or intimidating or threatening witnesses if he is released pending trial. Padavona already made violent threats against John Doe, Jane Doe and their families over money—this Court should have little confidence that Padavona would not resort to the same criminal tactics he has already engaged in when the stakes are higher.

V. <u>Conclusion</u>

    For the foregoing reasons, the government respectfully requests that the Court enter a permanent order of detention as to Padavona.

        Respectfully submitted,

        JOSEPH NOCELLA, JR.
        United States Attorney

    By:   /s/
        Stephanie Pak
        Assistant U.S. Attorney
        (718) 254-6064

cc: Clerk of Court (CHK)
   Counsel for all defendants